The last case on for argument today is Michael J. Pratt v. National Railroad Passenger Corp. May it please the court, my name is Rob Sullivan. I represent Michael Pratt, the appellant. Mr. Sullivan, I think Judge Sack wants to raise an issue. We'll sort of not take it out of your time and Mr. Hemley as well. It's a different issue but I think it's an important issue and quite separate from the merits of the case I guess. And that is we have of course seen the rather, this is a very devastating story about a 13 year old being killed by a train. And we've seen the videotape which is an extraordinary, it's different when you see the videotape particularly as an appellate judge rather than reading about what happened. And indeed in this case the tape together with the other recordings, electronic recordings but mostly the tape was I think essential to what the district court did, what you're asking us to do, maybe a little less so. And Scott, isn't that the name of the case, the Supreme Court case, interestingly, and we did a little case after that called CALFUS. Same kind of problem and the problem is this. In Scott, which was the Supreme Court case saying that the videotape can prevail at summary judgment I guess over even other personal eyewitnesses. And in CALFUS, which was vaguely similar, in each case the court made available to the public the tape about which we were talking. And they did that because it was all about look here's the tape and here's what it shows and there are a lot of people saying this but look here's the tape. And that's true of those two cases, this and some others. And my question is I'm torn a little. I can understand why the family does not want public a tape that actually it's not, you know, I don't want to make it sound worse than it is but it shows the moment. It doesn't show bodies or blood or anything but it shows the moment at which it happened. And I'm torn between the question of whether this is, if we're going to base our opinion substantially on what the tape shows or doesn't show, to do that and yet keep the tape sealed is a problem. And I wondered whether you and your, it's outside the merits of the case but I think it's a serious question and I wanted to raise it before you get into the merits of the case itself. And to address that, Your Honor, from . . . Why don't you address that and then if Mr. Hemley has something he would like to say about that we'll . . . Certainly. And then we'll start the argument on the merits of the case. Certainly. And to address that from our perspective, from the perspective of the family, there is not a major objection to the tape becoming public. Their preference was that it not and agreed essentially to Amtrak's requirement . . . In that case I wasted a lot of my breath. Thank you. Amtrak really required in order to produce the video to us that it be kept confidential. If Amtrak is willing to remove that requirement then I have no problem with that and neither does the family. Much appreciated. Thank you. Can we just hear from Mr. Hemley for a moment on that issue? Yes. Thank you, Your Honor. The reason for Amtrak requesting that the tape be sealed is to avoid it becoming a cause irrelevant to judicial proceedings on social media or any other place. I think given Judge Sack's concerns, we're prepared to allow the court to make it public. Thank you. Thank you. I say that without having consulted with my client who may take issue with me, but I'm going to take that chance. Okay. Thank you. We might hold it up a few days so if both of you want to consult again with clients and write to court if there's a different position. Okay. All right. Now we will hear our argument. Thanks to all. Mr. Sullivan, good morning. Thank you. Good morning. The videotape, I think, as is obvious, is key to this case. And the claim, really, that revolves around the videotape is the horn claim and whether there was an adequate warning given in the form of a horn. The trains move quickly. Often the sound does not arrive until the train does. The horn is an essential warning. And I think it revolves around the lower court's analysis of Scott V. Harris. And as we just heard in the earlier discussion, Scott V. Harris essentially boiling down to there may be other factual allegations. Do you think the video is unreliable, though? At some point you say we rely on parts of the video, and other times you say that some of the data is inconsistent with the video. Is this a Scott-type video that we can rely on, or is it unreliable? And it includes audio, too. I believe there's a contention, Your Honor, and I believe that some parts of the video are reliable and that we have contended that. And that's where the case differs from Scott. You've contended that it is reliable. That it is not reliable, Your Honor. Scott specifically says that where there is no contention that the video is unreliable or no attack on the reliability of the video, then the video will trump the typical jurisprudence of the evidence is viewed in the light most favorable to the non-moving party. In this case, I think it's... What's unreliable about it? Well, Your Honor, there are three types of, well, two types of recordings from the train in an incident like this, and there's multiple types of evidence, but sticking to the recordings, the two data recordings produced in the case are different. These are from a black box in the train, records when the horn is sounded, if the horn is sounded, brakes, brake pressure, various different mechanical parts of the train. Two of these were produced. When they were produced and the corporate witness testified about them, a lot of questions could not be answered. In fact, the corporate witness testified at that time that he could not distinguish which one was correct and which one wasn't. What was wrong? I mean, I think there was a difference of view on the horn sounding after the accident. Yes. Is there anything else that you thought was unreliable about the video? Well, there's a discrepancy when the horn is sounded. It actually puts in ones and zeros to say when or when the horn is not sounded and for how long. There was discrepancies between the both of them in that. How much? Excuse me? How much? In some cases, seconds or fractions of seconds, whether or not the horn was sounded before or after Mr. Pratt was struck. There were small discrepancies. However, there were discrepancies from what is a computer and should have not. I'm sorry, but I'm thinking of the video, which, much to my surprise, seems like a very clear recording of the blowing of the horn. And now, is there any reason to think that, leaving the discrepancy between the data aside, is there any reason to think that what we hear while we're watching this accident unfold is, for some reason, purposefully or not purposefully unreliable or untrue? Yes, Your Honor. Every single witness to the event says that it didn't occur. There was a witness at the actual railroad crossing, Michelle Penza. She actually testifies that she almost was struck by the train because she didn't see or hear it coming, stopped her vehicle. It is winter and her windows are up. She does testify. Playing loud music, right? She does. Not loud, Your Honor. She did testify that she had the radio on and that she had the heat on. What's the other witness, King? The other witness is Ms. King, who is coming. But that's in a state police report. In the state police report. Both are. How can we rely on that, though? Isn't it hearsay? It's a statement recorded in the state police report. A statement by a witness, her name is King. How is that not hearsay? Well, I don't believe that the report and what's in it is hearsay. I think the lower court considered it and the lower court considered it and dismissed it. The report is evidence in the case. Do you see my point about evidence? I do see that. There's got to be a duty. There can be double hearsay that's admissible in a police report, but the second level of hearsay, there's got to be a duty on that person to report. That's kind of evidence 101. King's statement is just rewritten by a state police investigator, and how is that reliable? Well, Your Honor, I think the standard, different at a summary judgment level, this is a summary judgment proceeding where the police report is presented as evidence and the contents thereof at trial, Ms. King would testify to what she observed. So we were limited in the summary judgment proceeding to what she had stated in the state police report. You didn't take her deposition, though, right? Her deposition was not taken, Your Honor. The other witness, other than the woman, Ms. King, and the woman who was at the crossing, was the other individual on foot who testified that he did hear a horn, did in fact hear a horn when he left his driveway, sounded like it was far off, and then never heard the horn again until one to two seconds is his testimony, and I'm going from memory, before the train hit Mr. Pratt. This is entirely in contradiction to the videotape. Ms. Penza saying that the horn was never sounded before Eric Pratt was hit is in contradiction. Ms. King's testimony is in complete contradiction that a horn wasn't sounded. So all of that evidence contradicts the videotape and- I guess I would say I would go with you if you had somebody who says this has been doctored, right? But to take black box evidence and toss it based on human perceptions, and you weren't here yesterday, but two of us were on a panel and hearing about identifications of people and what they look like, and it's governing this case, but the science out there on identification of witnesses or defendants or perpetrators is growing and growing, and human perception just ain't what we thought it was back in the 1200s and bring it forward all the way to today. So what do we do with that? I mean, I'd be going with you and saying, no, the jury's got to figure this out if you have an expert who says, you know, we went in, we looked at the program on the black box, and these things are missing, and there should be three ones here and two zeros, and somebody's hacked it. Well, I think, Your Honor, that we do have an expert that testifies that these things should be consistent and not inconsistent with each other if they come from the same data. But I think the key issue with respect to what you're asking is that not only are we entitled to the evidence viewed in the light most favorable to us, but all inferences to be viewed in that same favorable light, and the inference of having data recordings that do not match a video and witness testimony that universally contradicts the video, the inference is that something has been done to the video to change it. So I think that that fairly has been made expert or not, that allegation. Okay. We'll do with this case what we did before. If there's anything else you would like to argue before Mr. Hemley stands up, and we'll give Mr. Hemley the time that he needs as well. So anything else? You have reserved some time. I think that's the key issue unless anyone has any other questions, certainly. All right. Thank you, Mr. Sullivan. Mr. Hemley, good morning. Still morning? Yes. I'm sorry. May I ask my out-of-left-field question to you, which is a different one, and that is I read that the conductor was in the cab with the engineer, right? Yes. I think of the conductor as being back with the passenger saying, I don't know, Brattleboro in three minutes or something. How did he get up in the cab? Do you know? Unless he's busy with passengers, he can occasionally, and he testified at deposition that on this occasion he did go up front. He just happened to be there at that time. There wasn't a specific reason for it. Thank you. Yes. Well, Your Honors, of course, as Mr. Sullivan has, have focused on the issue in the case, which is whether or not the video evidence and the data recorder evidence are reliable. Are they inconsistent? They're not consistent. They're entirely . . . Not consistent or not inconsistent? They are consistent. Okay. They are consistent. This is precisely the question that Judge Sessions addressed in his decision. On page 120 of the appendix, Judge Sessions wrote, in this case, as in Scott, a video provides clear objective evidence of the events leading up to Eric's death. That evidence shows the train operator blowing the horn consistently before Eric reached the tracks. The data from the event recorder confirms the video. He then goes on to explain the eyewitness testimony as being less reliable and ultimately concludes that no reasonable juror could conclude that this video and consistent data evidence was unreliable. Most significant to the Court's questions a moment ago is the conclusion, and it is supported by the record. It's the absence of anything meaningful in the record. Plaintiff suggests that the video has been doctored in some way, but offers no evidence to support such conjecture. I also want to . . . So, Mr. Hemley, then you would be arguing, or you are arguing, that the different perceptions of the eyewitnesses, if you will, or the oral witnesses, is insufficient to . . . is an insufficient basis to credit what the black box and the recording show. It is in the absence of objective evidence of tampering with the black box data. This Court, just three weeks ago, decided a case called Adona v. D'Andrea. It was a three-judge panel that consisted of Judges Cabrano, Lynch, and Gardefe. I probably mispronounced that last one. Brownus, Lynch, and Gardefe, yes. You got Lynch right. I was close. In any event, that panel considered a case like most of the cases that raise this videotape issue, which was a prisoner's rights case. The prisoner contested that he had been abused by officers in an arrest situation. The officer had a body cam on. The panel that heard this case, which was just three weeks ago, on June 7th of 2017, following Scott v. Harris, said, Adona offers no objective proof capable of supporting his assertion that the videotape evidence had been tampered with. There, like this case, there is clear evidence of what happened. The horn sounded for 21 of the 30 seconds prior to reaching the crossing. It sounded for seven seconds immediately before impact, largely because Ms. Penza almost drove her car onto the train, onto the tracks, rather, and the engineer reacted to that. Mr. Sullivan identified several witnesses, two of whose testimony was secured by deposition. One was Kyle Shippey, who was the young man who was with the boy. He heard the horn but didn't hear it exactly the way it was sounded. And Michelle Penza, who testified, and it's in the appendix, was in a panic such that she couldn't even put her car into reverse and thought she was going to get hit. Can I ask you about the braking situation? Yes. How many seconds would have been required to make a difference here? Well, in order to make a difference, according to the undisputed evidence supported by the plaintiff's expert, the engineer would have had to apply the emergency brake before Eric came into view, so more than six and a half seconds prior to impact in order to slow the train down. There is absolutely . . . Sufficiently so he could have gotten out of the way. Sufficiently so he could have gotten out of the way. The engineer would have had to throw the train into emergency before even seeing Eric Pratt. When he saw his friend, was it Shippey? Well, neither of them was in view. It was coming around something of a bend. It was coming around a bit of a bend. There was vegetation, which is . . . No, there's no vegetation. In fact, the plaintiff has dropped . . . The vegetation. The vegetation claim and is no longer pursuing that on appeal, so the only claim here is the behavior of the crew and the application of the brake. The district court said seven seconds, and that's before Eric comes into view, but I think it's around the time that Kyle came into view, right? It's around the time Kyle comes into view. I believe it's six and a half seconds, but not the quibble. You have to subtract it from the videotape markers. The point there is that everyone agrees, as the district court observed, both of the experts, I should say, agree that there is a reaction time that's required before the action is meaningful. Does this implicate this open run duty issue too? In other words, the district court cited Andrews for the view that the open run duty applies too, which is you can assume that someone is going to stop when they see a train, right? That's what they're . . . Yes. There are duties that are established at common law under Vermont law. The case that is often cited for that is Star versus something, Transportation Company, which . . . Is there an open run duty case? It leads to my next question. Has this open run duty modification of reasonable care that's in the New York cases and here in the Second Circuit applying New York law, has that been adopted in Vermont? I thought the case you just mentioned was a last year chance case. No. It's a common law case from the 30s. In Vermont, there is a common law duty imposed on the pedestrian and on the public who can listen and to observe what's coming and to react in time. What Judge Sessions decided as well in this case was that the engineer has an obligation to the passengers not to put them in unnecessary danger. You can't . . . That is the open run duty. That's the justification. Part of the justification for that doctrine is you don't want trains to be braking all the time whenever there's a chance of someone making a crossing because it might injure a passenger. Has that been adopted in Vermont? Not specifically as such. In fact, I've not heard of anything expresses the open run duty until just now. It's news to me. It's certainly not a function of Vermont law, which applies simply the common law obligations of the passenger and the engineer at this crossing to exercise reasonable care. The other point, I wanted to address a question that Judge Sack asked Mr. Sullivan and then I think I'll be done. The discrepancy between the data recorders, as the court I'm sure appreciates by now, is a function of the size of the wheel subsequent to the motions being briefed but before argument. We provided supplementation that indicated that the correct measurement was thirty-seven and a half inches . . . Not the forty-one. Not forty-one, which was . . . Not forty-one. It doesn't make a difference. Which is the default position. None of these are material differences because in any event the train was not speeding, in any event it couldn't have braked in time to avoid the accident. What Judge Sessions found based on expert testimony was that it's not reasonable for the engineer to put the train into emergency as soon as he sees a pedestrian approaching a crossing. It's reasonable to assume that the pedestrian is going to see what's coming and take precautionary measures, stop in other words. But here, when it got to be two seconds left and Eric wasn't aware, the engineer put the train into emergency but it was just too late to stop. We did see in the tape how long . . . I mean it went right through until it stopped and that was some time . . . Absolutely. It goes right through until it stops and the reason that Mr. Scott, the expert for the plaintiff, originally said that it hadn't braked through impact was because he was relying on an estimate from the state police as to where the train would stop. That estimate was one-tenth of a mile, which is around 520 feet. That turned out to be wrong by almost 50% or 100%, whatever you calculated. It's 900 and something feet. That was the correct measurement, which makes it clear that the train and the video are consistent. It was blowing right through impact. I mean this is a terrible accident. We feel awful about it for the family, but it's not a function of negligence. I have my own theory as to what happened, which I'll share with you in two seconds. The freight trains had been stopping there all week long to load lumber at a lumber yard, which is just beyond this Bemis Crossing. When you see a headlight coming towards you, you can't tell whether it's a headlight or not. These kids did not want to wait in 10-degree weather, which is part of the record. They said, one said to the other, let's beat the train. Thinking it was a freight train, they took more time than they should have to get to the crossing. It's an unfortunate event, but it's not one for which Amtrak is responsible. I think the court properly granted summary judgment. Thank you, Mr. Hamilton. Thank you. Mr. Sullivan. Thank you, Your Honor. Just to address a few of the brief highlights, there was some discussion of objective evidence of tampering. The facts make that impossible. I'd be interested to know what objective evidence of tampering is, because what's in the record is that the data recorder for the video and the black box are immediately downloaded. All the data is taken off on the spot or at the next spot by the railroad, is then transferred to a computer, is then transferred to a disk, and is one data file that is then given to us in the litigation. There's no ability to objectively tell if any of that's been tampered with. It's all been done before anyone got to it. The corporate representative testified in this case, we cannot go back to that equipment and find anything about this event. As to objective evidence, if that's what's meant, there is none. I do believe that eyewitness testimony is objective evidence. They do not have any interest in the case. I believe that is objective evidence. If that directly contradicts what's on the videotape, then that's an objective  The other issue that I'd like to just quickly address is, yes, Open Run Doctrine has not been adopted by Vermont, as far as I can tell, because I did look for that issue, and Mr. Shippey, the individual who was ahead of Mr. Pratt, was in view well before, well before Mr. Pratt and before the six and a half seconds, which did, in fact, build in reaction time. The six and a half. You're saying that the engineer should have applied the brakes when he saw Mr. Shippey, irrespective of when he saw it. What I'm saying is that he could have, Your Honor, applied. He saw a pedestrian on the tracks well before the six and a half seconds, and that was Mr. Shippey. I don't think that- Is there a way that we can tell from the record how much time that was? You can. And the videotape, in fact, I believe the videotape that we submitted has a counter on it. And you can- And it does show Mr. Shippey crossing. It will show him come right up. Yes, Your Honor. Thank you. So that is objective. You don't have to take my word for it. If there are no other questions, then I'll be finished. Thank you both. Thank you very much. But thank you for your arguments. The final case on the calendar today is Frumosa versus Western District of New York is on submission. I will ask the clerk please to adjourn court. Court is adjourned.